**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                                  CR No. 09-3597 LH

JOSE ERNESTO SALAS-GARCIA,

        Defendant

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Jose Ernesto Salas-Garcia's Motion to Suppress [Doc. 39], filed February 22, 2010.  In a May 7, 2010 Memorandum Opinion and Order the Court ruled that Defendant had not made a substantial preliminary showing that the affiant intentionally or recklessly omitted material information in the search warrant affidavit and was, therefore, not entitled to a Frank's hearing.  On August 24, 2010 and August 31, 2010, the Court held evidentiary hearings on Defendant's Motion to Suppress, at which Defendant was present.  Defendant's Franks hearing request having been previously denied, the scope of the suppression hearings did not include the veracity of the affidavit.  At the conclusion of the hearings, the Court took the matter under advisement.

The outstanding issues remaining for the Court after the hearings are as follows:[1]  1)

---

[1] In its responsive brief, the Government contested Defendant's standing to challenge the search of the red Dodge truck.  However, at the August 24, 2010 suppression hearing, after hearing the testimony of Abel Zamora, the Government conceded that Defendant had standing to challenge the search of the red Dodge truck.  Moreover, the Government has not contested Defendant's standing with respect to the search of the plastic bag containing the cocaine, which was found within the red Dodge truck.  The evidence before the Court establishes that Defendant had lawful possession of the red Dodge truck at the time of the search and that he demonstrated a

whether officers had reasonable suspicion to justify the stop of the red Dodge truck; 2) whether the scope of the stop was reasonable and/or whether officers had probable cause to arrest Defendant; 3) whether Defendant's statements to law enforcement were made voluntarily; and 4) whether the magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause that cocaine would be found in the red Dodge truck.

Having considered the parties' briefs, the arguments of counsel, the relevant case law, and the evidence presented at the hearing, the Court finds that Defendant's motion is not well taken and hereby **denies** the motion.

## I. STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires a court to state its essential findings on the record when deciding a motion that involves factual issues. Fed. R. Civ. P. 12(d). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of Rule 12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which require a judge to decide preliminary questions relating to the admissibility of evidence. *See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *Fed. R. Evid.* 1101(d)(1). For instance, the Court may consider hearsay in ruling on a motion to suppress. *See Merritt*, 695 F.2d at 1269.

## II. FINDINGS OF FACT

The Court finds that the testimony of Clarence Davis and Oscar Villegas, both agents

---

legitimate expectation of privacy in the plastic bag containing the cocaine. Therefore, Defendant's standing is no longer at issue.

with the Albuquerque Police Department's ("APD's") Middle Rio Grande Narcotics Task Force, and the testimony of Jeffrey Mauldin, an agent with the Drug Enforcement Agency, was credible concerning the facts relevant to the motion. In contrast, the Court finds that the contradictory testimony given by Defendant's ex-wife, Antoinette Salas, was not credible. Furthermore, the Court makes the following factual findings:

In September 2009, members of APD's Middle Rio Grande Narcotics Task Force cultivated a confidential informant after he was arrested for distributing cocaine following the execution of a search warrant at his home. During a post-arrest interview, the confidential informant agreed to cooperate and to provide information to law enforcement in exchange for leniency in the prosecution of his drug offenses. Both Agent Oscar Villegas and Agent Clarence Davis of APD had some interaction with the confidential informant on the date of his arrest. According to Agent Davis, the confidential informant gave information that proved to be true and accurate, and Agent Davis therefore considered him to be reliable. Although Agent Davis did not personally interact with the confidential informant thereafter, he did not have information indicating that the he had thereafter become unreliable or offered inaccurate information to law enforcement. Additionally, from September 2009 to December 2009, the confidential informant twice provided Agent Villegas information that was corroborated and resulted in large drug seizures and arrests.

Sometime in late November 2009, the confidential informant advised Agent Villegas that he had first-hand knowledge that Edgar Ortiz Castaneda brokered deals for large quantities of cocaine at an auto body shop located in the area of Old Coors SW and Gonzales SW. The informant claimed to have had conversations with Castanada and to have witnessed transactions of cocaine. As a result of this information, Agent Villegas began investigating Castaneda and

initiated surveillance of him.

During such surveillance, Agent Villegas followed Castaneda, who was driving a red Chrysler 300M, to "Mor Body Shop," which was located at 627 Old Coors SW.

At the body shop, Agent Villegas observed unidentified subjects, who appeared to be associates rather than customers. He did not observe any legitimate business activity related to the body shop. He also saw Castaneda "hanging around" and constantly talking on his cell phone. Agent Villegas knew through past training and experience that drug traffickers often use businesses, such as but not limited to auto body shops, to conceal drugs and vehicle and pedestrian traffic not associated with legitimate business. Additionally, Agent Villegas learned that an ICE investigation had referenced an "A&M Auto Shop" in 2000 at the same address. Agent Villegas also knew, again through past training and experience, that drug traffickers often change the name of a business to give the appearance that ownership has changed, in an effort to elude law enforcement detection.

Sometime on or shortly before December 2, 2010, Agent Villegas tasked the confidential informant with arranging the purchase of an amount of cocaine using Castaneda as the broker. Thereafter, the confidential informant called Agent Villegas to confirm that he had ordered from Castanada the delivery of one kilogram of cocaine to occur on December 2, 2009. It was Agent Villegas' understanding that Castaneda was acting as the broker of the transaction; however, he did not know who would be acting as the seller.

On December 2, 2009, Agent Villgeas and Agent Davis, along with approximately three to four additional members of the task force, maintained constant surveillance of Castaneda from their respective unmarked vehicles. Once again, Castanada was seen arriving at Mor Body Shop in the red Chrysler 300M. Agent Davis testified that, even before the December 2, 2009

investigation, he had some familiarity with Mor Body Shop, because an independent confidential informant of his had advised that individuals were trafficking cocaine from the body shop.

Sometime in the afternoon of December 2, 2009, Agent Davis and Agent Villegas observed Castaneda leave Mor Body Shop and drive directly to La Poblana Tortilleria on Old Coors Dr., where he parked but did not exit the red Chrysler 300M. Concurrently with Castaneda's arrival at the tortilleria, the informant called Agent Villegas to confirm that the cocaine would in fact be delivered that day to the parking lot at Presbyterian Hospital.

A few minutes after Castaneda arrived at the tortilleria, a red Dodge truck arrived and parked next to Castaneda's vehicle. The driver of the red Dodge truck met with Castaneda, and the two men walked through two large wooden gates on the alley side, out of the officers' views. Within a few minutes, the men returned to their vehicles and left the tortilleria, driving east on Central. The two vehicles drove in tandem, mimicking each other's lane changes.[2] Agent Villegas and Agent Davis both knew through past training and experience that drug traffickers often use two or three vehicles as a counter surveillance technique – either to elude law enforcement or to prevent the theft of the drugs they are delivering.

Agent Villegas and Agent Davis followed as the red Chrysler 300M and the red Dodge truck traveled toward Presbyterian Hospital. Both vehicles entered the hospital parking lot, and the confidential informant, who was located at a vantage point where he could see vehicles

---

[2] Agent Davis' testimony differed from that of Agent Villegas as to which vehicle was leading and which was following. Agent Villegas testified, and his affidavit in support of the search warrant also indicated, that Castaneda followed Defendant. In contrast, Agent Davis testified that Defendant followed Castaneda. The Court, however, considers this testimonial inconsistency to be immaterial to the reasonable suspicion analysis. It is the act of tandem driving itself, not the fact that one particular vehicle led the other, that is significant to the analysis.

entering the hospital lots, reported, "the drugs are here." Castaneda pulled the red Chrysler 300M into the hospital's Emergency Room parking lot. The red Dodge truck turned into the main hospital entrance and continued south toward the entrance to Pediatric Urgent Care, on the south side of the hospital. From some distance away, Agent Villegas observed a female, who appeared to be coming from the hospital, enter the red Dodge truck. Agent Villegas instructed two APD patrol officers in marked vehicles to stop both the red Chrysler 300M and the red Dodge truck.

Defendant, who was driving the red Dodge truck, was stopped by one uniformed officer in a marked police car with its lights on. Defendant got out of the truck and was placed in handcuffs. Agent Villegas arrived a matter of seconds after the stop occurred. Although Agent Villegas parked his vehicle in front of the truck, and the uniformed patrol officer had parked behind it, Agent Villegas testified that there would have still been room for Defendant to leave in the truck. Several minutes later, Presbyterian Hospital security officers also responded to the area near the vehicle stop, though they did not assist in the investigation or the detention of Defendant.

Agent Villegas approached the passenger side of the vehicle and told the female passenger, Antoinette Salas, that he was conducting an investigation involving the driver of the red Dodge truck. Ms. Salas informed Agent Villegas that she was an employee of the hospital and that the driver of the truck was her ex-husband. According to Ms. Salas, she had received an unexpected, last-minute call from her ex-husband advising that he would be picking her up from work. Ms. Salas had therefore cancelled her alternate ride home. Concluding that Ms. Salas was not involved in the cocaine transaction with the confidential informant, Agent Villegas told Ms. Salas that she was free to leave, and he allowed her to use his phone to make arrangements for a

ride.  Ms. Salas remained at the hospital for a period of time as she waited for a ride home.

Although Agent Davis was briefly detained while in route to the hospital, he arrived at the red Dodge truck approximately two minutes after it was stopped.  When he arrived, Defendant was standing next to the red Dodge truck in handcuffs.  Shortly thereafter Agent Villegas turned the investigation over to Agent Davis and returned to his office to complete the paperwork for search warrants.

Agent Davis directed Defendant to approach his unmarked vehicle and advised him that he was not under arrest but that the officers were conducting an investigation.  Defendant was also patted down while he remained in handcuffs.  Defendant agreed to stay nearby and to cooperate with the investigation.  After conferring with Agent Villegas via radio, Agent Davis instructed the patrol officer to remove Defendant's handcuffs, which Defendant had been wearing for approximately four to ten minutes.  Defendant then sat on a nearby curb.  Agent Villegas also informed Agent Davis, either by radio or phone, that he had requested a K-9 unit, because he was unsure which vehicle was carrying the drugs.

Upon inspecting Defendant's driver's license, Agent Davis recognized Defendant's name from an independent DEA investigation regarding suspected drug-trafficking.  Therefore, Agent Davis contacted DEA Agent Jeffrey Mauldin, who responded to the vehicle stop.  When Agent Mauldin arrived, approximately ten minutes after he was alerted of the stop by Agent Davis, Defendant was no longer in handcuffs.

While Defendant was still sitting on the curb, Agent Davis told him that he wanted to ask him some "investigatory questions."  Agent Davis advised Defendant of his Miranda rights, speaking in Spanish, which he had done approximately five to ten thousand times before.  Defendant said that he understood and agreed to speak with Agent Davis.  Agent Davis' gun was

not displayed and neither the uniformed patrol officer nor Agent Mauldin were in the immediate vicinity.

After asking Defendant to be truthful, Agent Davis asked Defendant if he had any drugs. Defendant responded, "yes." When Agent Davis asked where, Defendant advised that they were in the truck. When asked how much, he said, "a kilo." When asked if it was cocaine, he said, "I think so." Finally, when asked where in the truck the drugs were located, he reported that they were "near the center with the tortillas and chilies from the store." Defendant also indicated that he was delivering the drugs for another person and that he was to be paid $400 for his transportation of the drugs. Agent Davis informed Agent Villegas, via cellular phone, that Defendant had admitted to being in possession of cocaine.

Agent Villegas sought and obtained a search warrant for the search of the red Dodge truck. The details of the affidavit supporting the application for the warrant are summarized in this Court's May 7, 2010 Opinion. (*See* Doc. 55 at 2-5.) Pursuant to the warrant, Agent Mauldin searched the red Dodge truck, finding a brick of cocaine in the center of the second row in a bag containing chilies.

### III.  DISCUSSION

Defendant seeks suppression of physical evidence and statements seized as a result of his seizure on December 2, 2009, and as a result of the search of the red Dodge truck.

    **A.**    **Stop of the Red Dodge Truck**

A traffic stop is a seizure that is treated as an investigative detention. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995). An investigative detention is an exception to the probable cause requirement. *See Terry v. Ohio*, 392 U.S. 1, 26 (1968). To determine whether an investigative detention is reasonable, the Court must determine: (1) whether the

officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *Botero-Ospina*, 71 F.3d at 786.

### 1. Initial Stop

An investigative detention is justified at its inception only if the officer is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity. *See Terry*, 392 U.S. at 20-21.

In his motion to suppress, Defendant cites *Alabama v. White*, 496 U.S. 325 (1990) for the proposition that, when a tip is involved, the prediction of future behavior is crucial to the reasonable-suspicion determination. He argues that, here, the confidential informant did not predict future behavior and that officers therefore lacked reasonable suspicion. The Government, in turn, maintains that, under *United States v. Samuels*, 493 F.3d 1187 (10th Cir. 2007), reasonable suspicion existed.

*Alabama v. White* is not directly on point. There, the Supreme Court considered the reliability of a tip given to police by an *anonymous* caller. *White*, 496 U.S. at 325. The anonymous tipster made predictions about the future behavior of an individual and suggested that drugs could be found in her attaché at a particular time. *Id.* Significantly, the Court distinguished the factual scenario there from a situation such as this, where the tip came from a known informant who had provided information to law enforcement in the past. *See White*, 496 U.S. at 328.[3]

---

[3] Additionally, in an earlier case, *Adams v. Williams*, 407 U.S. 143 (1972), the Supreme Court noted that a tip from a known informant provides a stronger case for reasonable suspicion

A tip from a confidential informant may justify an investigatory stop if it furnishes, under the totality of circumstances, both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur. *United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir. 1997); *Samuels*, 493 F.3d at 1191. Thus, the Court must evaluate both the reliability of the tip and its content.

Whether a tip is sufficiently reliable turns on "the credibility or veracity of the informant, the basis of the informant's knowledge, and the extent to which the police are able independently to verify the reliability of the tip." *Samuels,* 493 F.3d at 1191. Here, both Agent Davis and Agent Villegas testified that they considered the confidential informant to be reliable. The agents first became acquainted with the confidential during a post-arrest interview in September 2009, at which time he provided information that proved to be true and accurate. Although Agent Davis did not personally interact with him after September 2009, he did not have any information that he had since become unreliable. More importantly, from September 2009 to December 2009, the confidential informant twice provided Agent Villegas information, information unrelated to the December 2, 2009 investigation, that was corroborated and resulted in large drug seizures and arrests. The Court finds that this evidence regarding the confidential informant weighs in favor of a determination that he was reliable. *See, e.g., Leos-Quijada*, 107 F.3d 786, 792 (reasoning that the confidential informant and her tip were sufficiently reliable, where testimony established that her previous tips had resulted in the discovery of at least three marijuana loads and had led to successful apprehensions approximately fifty percent of the time). Second, the information that was conveyed from the confidential informant to Agent

---

than an anonymous telephone tip. *Id.* at 146.

Villegas was first-hand information, which the confidential informant learned from conversations with and observations of Castaneda.  Moreover, the confidential informant was directly involved in orchestrating the December 2, 2009 controlled drug buy with Castaneda.  Third, there was substantial independent corroboration of the confidential informant's tip.  Agent Villegas saw Castaneda drive to an auto body shop in the area described by the confidential informant and engage in activity that was consistent with drug trafficking, both during prior surveillance and on December 2, 2009.  Additionally, on December 2, 2009, Agent Villegas and Agent Davis observed Castaneda, in tandem with Defendant, drive to Presbyterian Hospital, where the drugs were to be delivered.  For all of these reasons, the Court finds that the confidential informant and his tip were reliable.

For reasonable suspicion to exist, the content of the tip, together with other information available to officers, must reasonably warrant a suspicion that Defendant was engaged in criminal activity.  *See Terry*, 392 U.S. at 20-21.  In this case, Agent Villegas observed Castaneda engaged in activities that were consistent with illegal drug activity at the auto body shop referenced by the informant in his original tip, including "hanging around" and constantly talking on his cell phone."  What Agent Villegas did not see was equally significant; he did not observe legitimate business activity related to the auto body shop, or customers, present at the business.  Further, Agent Davis had received independent information, from another confidential informant, indicating that drug-trafficking activities were taking place at the body shop.

On December 2, 2009, the day that Castaneda was to deliver one kilogram of cocaine for purchase to the confidential informant, Agent Villegas and Agent Davis saw Castaneda enter and leave Mor Body Shop and thereafter meet up with Defendant at a nearby tortilleria.  Concurrently with their arrival at the tortilleria, the confidential informant confirmed that the

11

drug transaction was indeed to take place that same day at Presbyterian Hospital.  Agent Villegas and Agent Davis saw Castaneda and Defendant engaged in apparent counter-surveillance techniques, including going out of view behind large wooden gates near the tortilleria and tandem driving in the direction of Presbyterian Hospital.  The agents knew from information provided by the confidential informant that Castaneda was acting as the broker of the transaction; however, they did not know the identity of the seller, or what his participation in the transaction would be.  The agents also knew from past training and experience that drug traffickers often use two or three vehicles as a counter surveillance technique.  Finally, Castaneda and Defendant were seen arriving at the hospital at roughly the same time, at which point the confidential informant alerted officers that "the drugs are here."

The totality of the circumstances here gave rise to reasonable suspicion to believe that Defendant was involved, with Castaneda, in illegal drug activity.  *See, e.g., Samuels*, 493 F.3d at 1191 (determining that the informant's tip – that a black man driving an El Camino was dealing drugs out of a particular convenience store parking lot – together with the high crime area of the convenience store and a man exiting the store and entering the El Camino, provided reasonable suspicion that a drug transaction was about to occur).  As such, the stop of Defendant and the red Dodge truck was justified at its inception.

### 2.     Scope of Continued Detention/Probable Cause for Arrest

An investigative detention may only last as long as necessary to effectuate the purpose of the stop.  *See United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003).  The scope of the detention must be carefully tailored to its underlying justification.  *Id*.  Generally, an officer must allow the driver to depart, once the initial justification for the traffic stop has concluded.  *Id.*  Questioning, even unrelated to the purpose of the stop, that does not appreciably lengthen the

detention does not require justification. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006).

Defendant suggests, in a relatively conclusory fashion that he was "immediately" arrested at the time of the traffic stop. The Government, on the other hand, classifies the pre-search seizure of Defendant as an investigative detention, arguing that Defendant was arrested only after the cocaine was recovered during the execution of the search warrant. The evidence before the Court supports the Government's classification of the initial seizure rather than Defendant's.

An arrest occurs when the police use a show of official authority such that a reasonable person would believe that he was not free to leave. *United States v. Edwards*, 242 F.3d 928, 934 (10th Cir. 2001). An arrest is characterized by a highly intrusive or lengthy search or detention. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).

Although Defendant was apparently removed from the red Dodge truck, that act alone is permissible during the course of an investigative detention. "[T]he Supreme Court established a bright-line rule that, during a lawful traffic stop, officers may order passengers out of the car as a matter of officer safety." *United States v. Ladeaux*, 454 F.3d 1107, 1110 (10th Cir. 2006) (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997)). Additionally, more forceful techniques are sometimes permissible during the course of an investigative detention, if officers had reasonable suspicion to be concerned for their safety. *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998) ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

It is undisputed that Defendant was both handcuffed and subjected to a pat-down search

13

during the course of his seizure. With respect to the use of handcuffs during a detention, the

Tenth Circuit recently reiterated:

> Handcuffing may be appropriate during an investigative detention - an
> investigative detention does not become unreasonable just because officers
> handcuff an individual. Officers are authorized to handcuff individuals during the
> course of investigative detentions if doing so is reasonably necessary to protect
> their personal safety or maintain the status quo.  However, the use of handcuffs is
> greater than a de minimus intrusion and thus requires the government to
> demonstrate that the facts available to the officer would warrant a man of
> reasonable caution in the belief that the action taken was appropriate.

*Lundstrom v. Romero*, __ F.3d ____,  2010 WL 3222048, 8 (10th Cir. 2010) (internal quotations

and citations omitted).  Similarly, pat-down searches are generally only permissible during an

investigative detention if the officer "harbors an articulate and reasonable suspicion that the

person is armed and dangerous. " *Hishaw*, 235 F.3d at 570.

In the Court's view, the use of handcuffs and the pat-down search, which were employed

in the detention of a person that officers suspected was in the course of delivering cocaine to a

buyer, were reasonable and did not escalate the detention into an arrest.  After all, "a connection

with drug transactions can support a reasonable suspicion that a suspect is armed and

dangerous."  *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006); *see also United

States v. Johnson*, 364 F.3d 1185, 1194-95 (10th Cir. 2004) (recognizing that drug dealing is a

crime "typically associated with some sort of weapon, often guns"); *United States v. Bustos-

Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently

associated with drug transactions, it is reasonable for an officer to believe a person may be

armed and dangerous when the person is suspected of being involved in a drug transaction").

Further, although the patrol officer who effected the stop of Defendant's vehicle was

justifiably cautious when he handcuffed and patted down Defendant, there is no credible

14

evidence that he drew or displayed his weapon, forced Defendant to the ground, or employed restraints other than handcuffs. Accordingly, the Court finds that the techniques used in the detention of Defendant – again, a person suspected of being in the course of delivering cocaine to a buyer – were reasonable under the circumstances and did not escalate the seizure into an arrest.

Morever, the Court finds that the period of Defendant's investigative detention was not unreasonably long. The reasonableness of the period of detention generally turns on whether the officers acted diligently and did not unnecessarily delay their legitimate investigation. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 687-88 (1985) (holding that 20-minute detention was reasonable where police acted diligently and did not unnecessarily delay legitimate investigation).

Here, it appears that the officers acted diligently throughout the course of their investigation of Defendant. Defendant's handcuffs were removed after approximately four to ten minutes, once Defendant was advised of the investigation and patted down. At that time, both Agent Davis and Agent Villegas testified that Defendant would have been free to go, though they would not have allowed him to leave in the red Dodge truck. Defendant, having agreed to cooperate in the investigation, sat nearby on a curb as officers continued their investigation. During the balance of the investigation, the agents contacted the DEA, read Defendant his Miranda rights, asked Defendant investigatory questions concerning his participation in the cocaine transaction, and secured and executed a search warrant for the red Dodge truck. There is simply no credible evidence that the officers unreasonably delayed Defendant's investigatory detention or their investigation regarding the red Dodge truck.

### B. Voluntariness of Defendant's Statements

Defendant argues in his briefing that if his seizure was illegal, it tainted his voluntariness to make statements to government agents, as there was no sufficient act of free will to purge the taint of the illegal seizure. On the other hand, if the seizure was legal, he argues that the statements he made were simply not voluntary.

Although it appears that Defendant was given his Miranda warnings, and properly waived them, prior to making admissions, it does not necessarily follow that Defendant's due process rights were not violated. *See Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (holding that an involuntary confession violates the Due Process Clause of the Fifth and Fourteenth Amendments). Although no such evidence was elicited during the suppression hearings, Defendant argues in his briefs that his statements to police were involuntary in that he succumbed to questioning only after being told that the red Dodge truck was being secured pending a search warrant.

The test for the voluntariness of a statement is simply whether the statement was voluntary considering the totality of circumstances. *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987). The Court looks to coercive police activity, express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1976). No single factor is determinative, but factors include:

1. the suspect's age, education, and intelligence;
2. the length of the detention and questioning;
3. any advice of a suspect's constitutional rights; and
4. the use of physical punishment.

*Chalan*, 812 F.2d at 1307. Cases in which a suspect can, despite the fact that the law

enforcement authorities adhered to the dictates of *Miranda*, make a colorable argument that a self-incriminating statement was "compelled" are rare. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

Here, both the length and manner of questioning were reasonable. As noted above, Defendant remained in the handcuffs for a mere four to ten minutes, during which time he was informed of the investigation and patted down. When Agent Davis began questioning Defendant, he was no longer in handcuffs and both he and Agent Davis wear seated on a curb near the area of the vehicle stop. Agent Davis' gun was not displayed and neither the patrol officer who stopped Defendant nor Agent Mauldin were in the immediate vicinity. That Defendant's statements may have been made after Defendant was advised that his truck was being secured pending a search warrant is not itself evidence of involuntariness. *Cf. United States v. Jones*, 1993 WL 470749, Nos. 92-3462, 93-3160, *2 (10th Cir. Nov. 17, 1993) (holding that the defendant's consent to search his vehicle was voluntary, even though the officer told the defendant that he could obtain a search warrant if consent was not given); *United States v. Hummer*, 916 F.2d 186, 190 (4th Cir.1990) ("The fact that a search warrant was mentioned does not necessarily constitute a coercive factor negating consent."); *United States v. Talkington*, 843 F.2d 1041, 1049 (7th Cir.1988) ("the threat to obtain a search warrant, by itself, does not vitiate a voluntary consent"). As such, the Court concludes that Defendant's statements were voluntary.

### C. Probable Cause Supporting the Search Warrant for the Red Dodge Truck

Defendant argues in his reply brief that the affidavit supporting the search warrant was so lacking in indicia of probable cause as to render official belief in the existence of probable cause regarding Defendant entirely unreasonable. This position is untenable considering the facts included in the affidavit, (*see* Doc. 55 at 2-5), including Defendant's confession that he had in his red Dodge

truck a kilogram of cocaine.  Even if the confession was disregarded, viewing the issuing judge's decision in the light most favorable to the Government as this Court must , *United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001), the magistrate had a "'substantial basis' for concluding that the affidavit in support of the warrant established probable cause." *United States v. Nolan*, 199 F.3d 1180, 1181 (10th Cir. 1999).  Notably, in testing the sufficiency of probable cause, courts may look at information received from a confidential informant, so long as other matters contained in the warrant corroborate the informant's statement.  *See Jones v. United States*, 362 U.S. 257, 269 (1960); *United States v. Hager*, 969 F.2d 883, 887 (10th Cir. 1992) (holding probable cause existed where independent investigation corroborated informant's report).

## IV. CONCLUSION

For all of these reasons, the Court concludes that the stop of Defendant and the red Dodge truck was supported by probable cause and therefore justified at its inception, that the manner and duration of the continued detention was reasonable, that the Defendant's statements to law enforcement were voluntary, and that there was probable cause supporting the search warrant for the red Dodge truck.

**IT IS THEREFORE ORDERED** that Defendant Salas-Garcia's Motion to Suppress is hereby **denied**.

_____
SENIOR UNITED STATES DISTRICT JUDGE